PHILLIP A. TALBERT
United States Attorney
DENISE N. YASINOW
ROBERT J. ARTUZ
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

FILED
Aug 11, 2022
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KAYMEISHA KEYES,

    Defendant.

CASE NO. 2:22-cr-00174 JAM

18 U.S.C. § 1343 – Wire Fraud (6 counts); 18 U.S.C. § 1341 – Mail Fraud (8 counts); 18 U.S.C. § 1029(a)(5) – Access Device Fraud; 18 U.S.C. § 1028A(a)(1) – Aggravated Identify Theft; 18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(B), and 1029(c)(1)(C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

## INDICTMENT

COUNTS ONE THROUGH SIX: [18 U.S.C. § 1343 – Wire Fraud]

The Grand Jury charges:

KAYMEISHA KEYES,

defendant herein, as follows:

### INTRODUCTION

1. At times material, in the State and Eastern District of California, and elsewhere, Defendant KEYES and others known and unknown to the Grand Jury engaged in a material scheme and artifice to defraud, with the purpose of obtaining money from the State of California and the United States by submitting fraudulent pandemic-related unemployment insurance claims.

INDICTMENT

1

2. At times material:

*Federal and State Unemployment Insurance*

3. Unemployment insurance (UI) was a state-federal program that provided monetary benefits to eligible lawful workers. Although state workforce agencies (SWAs) administered their respective UI programs, they were required to do so in accordance with federal laws and regulations. UI payments ("benefits") were intended to provide temporary financial assistance to lawful workers who were unemployed through no fault of their own. Each state set its own additional requirements for eligibility, benefit amounts, and length of time benefits could be paid. Generally, UI weekly benefit amounts were based on a percentage of earnings over a base period. In the State of California, the Employment Development Department (EDD) administered the UI program, which was based in Sacramento, California.

4. On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security (CARES) Act was signed into law. It expanded states' ability to provide assistance to many workers impacted by COVID-19, including for workers who were not ordinarily eligible for UI benefits. The CARES Act provided three new temporary UI programs: Pandemic Unemployment Assistance (PUA); Pandemic Emergency Unemployment Compensation (PEUC); and Federal Pandemic Unemployment Compensation (FPUC).

5. The first program, PUA, initially provided for up to 39 weeks of benefits to individuals who were: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act; and (2) unemployed, partially unemployed, unable to work, or unavailable to work due to COVID-19 related reason(s). Coverage included individuals who had exhausted all rights to regular UC or extended benefits under state or federal law or PEUC. Business owners, self-employed workers, independent contractors, or gig workers could qualify for PUA benefits administered by the California EDD if they previously performed such work in California and were unemployed, partially unemployed, unable to work, or unavailable to work due to COVID-19. PUA claimants were required to answer specific questions to establish their eligibility for PUA benefits, including providing their name, Social Security Number (SSN), and mailing address and self-certifying that they met one of the COVID-19 related

INDICTMENT 2

reasons for being unemployed, partially unemployed, or unable or unavailable to work. Initially, the eligible timeframe to receive PUA was from weeks of unemployment beginning on or after January 27, 2020, through December 31, 2020.

6. The second program, PEUC, initially provided for up to 13 times the individual's average weekly benefit amount to individuals who had exhausted regular UI under state or federal law, had no rights to regular UI under any other state or federal law, were not receiving UI under the UI laws of Canada, and were able to work, available for work, and actively seeking work. The eligible timeframe to receive PEUC was from the weeks of unemployment beginning after the respective state had an established agreement with the federal government through December 31, 2020. The earliest eligible date was April 5, 2020.

7. The third program, FPUC, provided individuals who were collecting regular UI, PEUC, PUA, and several other forms of UC with an additional $600 per week. The eligible timeframe to receive FPUC was from the week of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest eligible date was April 5, 2020.

8. Regardless of which of the three programs described above was involved (that is, PUA, PEUC, or FPUC), UI benefits were distributed to program participants by the California EDD. These funds were received by the EDD from the United States Department of the Treasury.

*California's Unemployment Insurance Program*

9. In California, UI claims were commonly filed online through the EDD website, and this was typically accomplished using an electronic device that could access the Internet. When an individual filed an online UI claim, EDD automatically maintained certain information regarding the filing of the claim. This information included the date and time the claim was submitted, the name of the person for whom the claim was filed, and the IP address of the device, or ISP account, that was used to file the claim.

10. UI claimants were required to answer various questions to establish their eligibility for UI benefits, including providing, for example, their name, SSN, and mailing address. The claimants were also required to identify a qualifying occupational status and/or COVID-19 related reason for being out

of work.

11. After EDD accepted a UI claim, EDD typically deposited UI funds to an Electronic Benefit Payment (EBP) debit card administered by Bank of America (BofA), which claimants could use to withdraw cash and pay for their expenses. The debit card was sent via the U.S. Postal Service to the claimant at the address the claimant provided in the UI claim. Claimants could activate their debit card over the phone or online.

12. When receiving regular UI benefits, claimants were typically required to complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that they remained unemployed and eligible to receive UI benefits. EDD authorized and deposited payment to the debit card after it received the Continued Claim Form.

13. After October 1, 2020, California EDD required UI claimants to verify their identities before a UI claim could be filed online. EDD outsourced the identity verification process to a private vendor called ID.me. To comply, the claimant was required to visit the EDD website and login to their account. The claimant was then prompted to login to, or create a new, ID.me account. On the ID.me website, claimants were required to submit personally identifiable information (PII) – including, without limitation, their name, date of birth, SSN, email address, and phone number – for verification. The claimant was also required to upload a copy of a government ID and a live self-taken photograph (or "selfie") of their face. This information was submitted to ID.me, which received the data in its computer servers outside of California. ID.me used this information (and other data) to verify the claimant's identity, which was material and essential to the UI application and approval process. If the claimant's submission passed ID.me's verification process, ID.me transmitted an interstate wire communication to EDD's servers located within the Eastern District of California. This communication included claimant PII and was an indication that ID.me had verified the claimant's identity. Once a claimant's identity was verified through ID.me, they were permitted to re-access their EDD account and complete the UI benefit application process.

14. Beginning in or about October 2020 and continuing through in or about August 2021, KEYES resided at Address 1 in Tracy, State and Eastern District of California. Between in or about April 2020 and continuing through in or about October 2020, KEYES resided at one or more other

addresses in Northern California.

## SCHEME AND ARTIFICE TO DEFRAUD

15. Beginning at least as early as April 2020 and continuing through in or about August 2021, in the State and Eastern District of California, and elsewhere, KEYES and others known and unknown to the Grand Jury did knowingly devise, intend to devise, and participate in, with the intent to defraud, a material scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, promises, and the concealment of material facts.

16. The purpose of the scheme and artifice to defraud was to obtain money from the State of California and the United States by submitting fraudulent UI claims to EDD.

## MANNER AND MEANS

In furtherance of the scheme and artifice to defraud, the defendant used the following manner and means, among others:

17. KEYES obtained the PII of persons whose employment statuses and eligibility for California UI benefits were unknown to her, including but not limited to that of Persons 1 through 8. Such PII included, without limitation, the persons' names, dates of birth, and SSNs. She obtained these persons' PII with the intent to fraudulently use their identities to apply for and obtain California UI benefits.

18. KEYES, and other individuals known and unknown to the Grand Jury, used this PII and other information to complete and submit over 70 fraudulent UI benefit claim applications to California EDD under the corresponding persons' identities. In each application, KEYES and her co-schemers provided material information such as a name, DOB, SSN, residence address, mailing address, and employment status and history. She and her co-schemers submitted these claim applications online via California EDD's website and other websites on the Internet. She typically did not have authority from the putative claimants whose identities she used to submit these UI claims.

19. The underlying UI benefit applications contained false and fraudulent representations, including, without limitation, that the claimants had worked or resided in California; had specific annual incomes; had worked during particular time periods; had been self-employed as barbers, account managers, or cashiers; had been laid off and had no work; were newly unemployed due to a disaster

including the COVID-19 pandemic; and were currently available to work. KEYES was aware that these claims were false, in that the individuals were not so previously working, residing, employed, newly unemployed, or seeking new employment as she represented in the applications. She also knew that these representations regarding the claimants' employment and availability to work were false at the time they were made, or she lacked the knowledge and authority to make such representations regarding each claimant. In the applications, KEYES often substituted her home address (Address 1) or addresses of her co-schemers for the claimants' mailing and residential addresses.

20. The false information that KEYES knowingly reported to EDD on the UI benefit applications caused EDD to approve and calculate the fraudulent UI benefits ultimately paid out, and was material and essential to EDD's decision to pay and continue to pay the UI benefits. California EDD would have denied a claim if a claimant had answered truthfully that, for example, he or she had not worked within the prescribed period, had not worked or resided in California, or was unavailable to work. Similarly, EDD would have denied a claim if it knew KEYES had submitted the claim application posing as the purported claimant, or if EDD knew that she had done so without the claimant's authorization.

21. For many of the more than 70 fraudulent claims, including those for Persons 1 through 6, KEYES submitted information to ID.me to have the purported claimant identities verified as part of EDD's UI application process. For each claim and application, this information included one or more of the following: (1) claimant PII, (2) an image of a fake government ID containing claimant PII and an image of KEYES or one of her co-schemers posing as the claimant, and (3) a separate image of KEYES or one of her co-schemers. KEYES caused ID.me to use this fraudulent information to mistakenly verify the identities of many of the purported claimants. If ID.me approved a claimant identity, it transmitted information to EDD via interstate wire indicating such approval.

22. The false and fraudulent representations contained in the underlying UI applications, including those claims for Persons 1 through 8, were material and essential to California EDD's decision regarding whether to approve those claims and pay out UI benefits.

23. For many of KEYES's fraudulent applications, she caused EDD to approve the claims and pay out UI benefits. These funds included UI benefits administered under the CARES Act. Upon

approval, EDD notified BofA, which issued a BofA-EDD debit card and mailed it to the address provided on the claim, often to KEYES's home address at Address 1 or other addresses under the control of her and/or her co-schemers. KEYES and her co-schemers then used the debit cards to spend the benefit proceeds, including withdrawing cash and purchasing goods. During this scheme, EDD periodically caused additional UI funds to be wired into the BofA accounts associated with the cards.

24. In carrying out the scheme, KEYES at all times material acted with the intent to defraud, including the intent to deceive and cheat.

25. KEYES's scheme and artifice to defraud caused the filing of fraudulent UI benefit claims that sought over $2 million in benefits and caused California EDD and the United States to incur actual losses exceeding $1.1 million.

## USE OF INTERSTATE WIRES

26. On or about the following dates, in the State and Eastern District of California, and elsewhere, for the purpose of executing the aforementioned scheme and artifice to defraud, and attempting to do so, KEYES did knowingly transmit and cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals and sounds, specifically:

| Count | Date | Description of Wire |
|---|---|---|
| 1 | January 20, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 1, including without limitation SSN ending 5485. |
| 2 | January 20, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 2, including without limitation SSN ending 2650. |
| 3 | January 26, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 3, including without limitation SSN ending 8522. |
| 4 | February 4, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 4, including without limitation SSN ending 5386. |

| Count | Date | Description of Wire |
|---|---|---|
| 5 | February 17, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 5, including without limitation SSN ending 4600. |
| 6 | May 1, 2021 | Interstate wire communications from ID.me's computer servers to California EDD's computer servers regarding identity verification results determined based on the PII of Person 6, including without limitation SSN ending 3397. |

All in violation of Title 18, United States Code, Section 1343.

COUNTS SEVEN THROUGH FOURTEEN: [18 U.S.C. § 1341 – Mail Fraud]

The Grand Jury charges:

KAYMEISHA KEYES,

defendant herein, as follows:

27. The previous Paragraphs 1 through 26 are incorporated herein by reference.

USE OF MAILINGS

28. On or about the following dates, in the State and Eastern District of California, and elsewhere, for the purposes of executing the aforementioned scheme and artifice to defraud, and attempting to do so, KEYES knowingly caused, according to her direction, the following mail matter to be placed in a post office and an authorized depository for mail matter and to be sent and delivered by the U.S. Postal Service and interstate mail carrier:

| Count | Date | Mail Matter |
|---|---|---|
| 7 | October 11, 2020 | EDD debit card in name of Person 7, ending 5309, administered by Bank of America, mailed to Oakland, CA. |
| 8 | November 30, 2020 | EDD debit card in name of Person 8, ending 1538, administered by Bank of America, mailed to Address 1 in Tracy, CA. |
| 9 | February 7, 2021 | EDD debit card in name of Person 3, ending 9353, administered by Bank of America, mailed to Pleasant Hill, CA. |
| 10 | February 14, 2021 | EDD debit card in name of Person 1, ending 0474, administered by Bank of America, mailed to Address 1 in Tracy, CA. |
| 11 | February 14, 2021 | EDD debit card in name of Person 2, ending 2809, administered by Bank of America, mailed to Address 1 in Tracy, CA. |
| 12 | March 9, 2021 | EDD debit card in name of Person 5, ending 7662, administered by Bank of America, mailed to Vallejo, CA. |

| Count | Date | Mail Matter |
|---|---|---|
| 13 | March 14, 2021 | EDD debit card in name of Person 4, ending 8339, administered by Bank of America, mailed to Address 1 in Tracy, CA. |
| 14 | June 9, 2021 | EDD debit card in name of Person 6, ending 6354, administered by Bank of America, mailed to Oakland, CA. |

All in violation of Title 18, United States Code, Section 1341.

COUNT FIFTEEN: [18 U.S.C. § 1029(a)(5) – Access Device Fraud]

The Grand Jury further charges: T H A T

KAYMEISHA KEYES,

defendant herein, between on or about February 19, 2021, and on or about August 25, 2021, in the State and Eastern District of California, and elsewhere, did knowingly and with intent to defraud effect transactions with at least one access device issued to another person or persons, to wit, an access device in the name of Person 3, ending 9353, among others, to receive payment or other things of value, the aggregate value of which was equal to or greater than $1,000, said activity affecting interstate commerce, all in violation of Title 18, United States Code, Section 1029(a)(5).

COUNT SIXTEEN: [18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft]

The Grand Jury further charges: T H A T

KAYMEISHA KEYES,

defendant herein, between on or about January 20, 2021, and on or about June 9, 2021, in the State and Eastern District of California, and elsewhere, did knowingly transfer, possess, and use, without lawful authority, a means of identification of each of Persons 1 through 6 – including a name, date of birth, and Social Security Number – during and in relation to felony violations of Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud), knowing that the means of identification belonged to another actual person, all in violation of Title 18, United States Code, Section 1028A.

FORFEITURE ALLEGATION: [18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(B), and 1029(c)(1)(C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture]

1.  Upon conviction of one or more of the offenses alleged in Counts One through Fourteen of this Indictment, defendant KAYMEISHA KEYES shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), all property, real and personal, which constitutes or is

derived from proceeds traceable to such violations, including but not limited to the following:

      a.     A sum of money equal to the amount of proceeds traceable to such offenses, for which defendant is convicted.

2.     Upon conviction of the offense alleged in Count Fifteen of this Indictment, defendant KAYMEISHA KEYES shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(B), any property constituting or derived from proceeds obtained directly or indirectly, as a result of said violation, including but not limited to the following:

      a.     A sum of money equal to the amount of proceeds obtained directly or indirectly, as a result of such offense, for which defendant is convicted.

3.     Upon conviction of the offense alleged in Count Fifteen of this Indictment, defendant KAYMEISHA KEYES shall forfeit to the United States, pursuant to 18 U.S.C. § 1029(c)(1)(C), any personal property used or intended to be used to commit the offense.

4.     If any property subject to forfeiture as a result of the offenses alleged in Counts One through Fifteen of this Indictment, for which defendant is convicted:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third party;

      c.     has been placed beyond the jurisdiction of the court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §§ 982(b)(1) and 1029(c)(1)(C)(2), and 28 U.S.C. § 2461(c), incorporating 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant, up to the value of the property subject to forfeiture.

A TRUE BILL.

/s/ Signature on file w/AUSA

FOREPERSON

PHILLIP A. TALBERT
United States Attorney

INDICTMENT                       10

No. 2:22-cr-00174 JAM

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

THE UNITED STATES OF AMERICA

*vs.*

KAYMEISHA KEYES

### I N D I C T M E N T

**VIOLATION(S):**
18 U.S.C. § 1343 – Wire Fraud (6 counts);
18 U.S.C. § 1341 – Mail Fraud (8 counts);
18 U.S.C. § 1029(a)(5) – Access Device Fraud;
18 U.S.C. § 1028A(a)(1) – Aggravated Identify Theft;
18 U.S.C. § 981(a)(1)(C), 982(a)(2)(B), 1029(c)(1)(C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

*A true bill,*

/s/ Signature on file w/AUSA
--------------------------------
*Foreman.*

*Filed in open court this* _____ 11th \_ *day*

*of* \_ August _____ , *A.D. 20* 22 \_\_\_

_____ /s/ N. Cannarozzi _____
*Clerk.*

*Bail, $* \_ No bail bench warrant to issue.

_____
JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

GPO 863 525

<u>**United States v. Keyes**</u>
**Penalties for Indictment**         2:22-cr-00174 JAM

### COUNTS 1–6:

VIOLATION:     18 U.S.C. § 1343 – Wire Fraud

PENALTIES:     Up to 20 years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### COUNTS 7-14:

VIOLATION:     18 U.S.C. § 1341 – Mail Fraud

PENALTIES:     Up to 20 years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release of up to 3 years

### COUNT 15:

VIOLATION:     18 U.S.C. § 1029(a)(5) – Access Device Fraud

PENALTIES:     Up to 15 years' imprisonment; or
Fine of up to $250,000; or both fine and imprisonment
Supervised release up to 3 years

### COUNT 16:

VIOLATION:     18 U.S.C. § 1028A(a)(1) – Aggravated Identity Theft

PENALTIES:     Mandatory 2 years in prison to run consecutive to any other term imposed
Fine of up to $250,000, or both fine and imprisonment
Supervised release of 1 year

SPECIAL ASSESSMENT: $100 (mandatory on each count)

### FORFEITURE ALLEGATION:

VIOLATION:     18 U.S.C. §§ 981(a)(1)(C), 982(a)(2)(B), and 1029(c)(1)(C), and 28 U.S.C. § 2461(c) – Criminal Forfeiture

PENALTIES:     As stated in the charging document